## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

PEGGY TENCZA,

     Plaintiff,

vs.                              Civ. No. 09-430 JP/LFG

S.R. KOEHNKE, JOHNNY YARA,
ZAZZA GREEN, HOLLY STEPHENSON,
BRUCE WORLEY, SR., and RAY SCHULTZ,
individually and in their official capacities, and
THE CITY OF ALBUQUERQUE,

     Defendants.

## MEMORANDUM OPINION AND ORDER

On May 4, 2009, this case was removed from the Second Judicial District Court of New Mexico to this United States District Court. (Notice of Removal, Doc. No. 1). The case was assigned to United States Magistrate Judge W. Daniel Schneider, but because the parties did not consent to the assignment to him, on May 28, 2009, the case was reassigned to United States District Judge Judith C. Herrera (Minute Order, Doc. No. 8).

On July 16, 2009, Defendants Steven Koehnke, Johnny Yara, Zazza Green, Holly Garcia,[1] Bruce Worley, Sr., and Ray Schultz (collectively "Defendants") filed Defendants Koehnke, Yara, Green, Stephenson (Garcia), Werley, Sr., and Schultz's Motion and

---

[1] Although Plaintiff's Amended Complaint (Doc. No. 24) names "Holly Stephenson" as one of the Defendants, it appears from Defendants' Motion that Holly Stephenson now goes by Holly Garcia. As her affidavit clarifies, Holly Garcia, during the time period relevant to this case, was known as Holly Stephenson. However, Defendants' Motion refers to her throughout as Holly Garcia. Therefore, to avoid confusion and to maintain consistency with Defendants' Motion, the Court will refer only to Holly Garcia.

Memorandum in Support Requesting Dismissal of Plaintiff's Amended Complaint on Immunity and Other Grounds ("Motion for Summary Judgment")(Doc. No. 28).  On September 4, 2009, Defendants filed their reply to Plaintiff's response to the motion for summary judgment (Doc. No. 34) along with a Notice of Completion of Briefing (Doc. No. 35).

From September 4, 2009, when the Motion for Summary Judgment was fully briefed, until more than five months later on February 12, 2010, there were no filings in the case and the Motion for Summary Judgment remained pending and unaddressed. On February 12, 2010, United States District Judge Judith C. Herrera, without explanation, recused and the case was reassigned to United States District Judge M. Christina Armijo (Minute Order, Doc. No. 36).  On February 19, 2010, United States District Judge M. Christina Armijo, without explanation, recused and the case was reassigned to Senior United States District Judge C. LeRoy Hansen (Minute Order, Doc. No. 37).  On February 24, 2010, District Judge C. LeRoy Hansen, without explanation, recused and the case was reassigned to Senior United States District Judge James A. Parker (Minute Order, Doc. No. 38).

The subject of this Memorandum Opinion and Order is the Motion for Summary Judgment (Doc. No. 28) filed July 16, 2009.[2]

---

[2] Before beginning its discussion of Defendants' Motion for Summary Judgment the Court pauses to note its displeasure regarding the exceedingly poor quality of the parties' briefing.  The deficiency of the briefing is certainly attributable, in part, to Plaintiff's vague, and at times incoherent allegations in Plaintiff's Amended Complaint (Doc. No. 24).  However, Plaintiff's inartful pleading of her Amended Complaint does not relieve the parties of their obligation to develop their legal arguments adequately and to present them in a manner that assists the Court in its analysis.  As discussed below, Plaintiff cited almost no legal authority to support her arguments beyond passing references to authority cited by Defendants.  Similarly, Defendants at times relied on inapplicable, overly narrow, or convoluted constructions of the law that frustrate the Court's analysis of the actual issues in the case.  The parties' lack of professionalism in preparing their briefs has resulted in unnecessary waste of the Court's time and resources; the Court has been required to do research that counsel should have done. The insouciance exhibited in the parties' briefing is troubling and will not be tolerated in future filings.

**BACKGROUND**

The circumstances giving rise to this case span a period of approximately two years, beginning in August 2006 and continuing through July 2008.  On August 2, 2006, Norbert Tencza, the now ex-husband of Plaintiff Peggy Tencza, went to the Albuquerque Police Department ("APD") Southeast Substation to make a complaint.[3] (*See* Koehnke Aff. ¶¶ 2-3, attached to Mot. Summ. J as Ex. A.)  APD Detective Steven Koehnke met with Norbert. (*Id.*)  Norbert explained to Detective Koehnke that he and Peggy were going through a divorce and claimed that Peggy had been sending Norbert, what Norbert perceived to be, harassing e-mails since June 22, 2006.  (*Id.* ¶ 4.) Furthermore, Norbert claimed that Peggy had sent what Norbert thought were threatening letters to his family members.  (*Id.* ¶ 6.) Moreover, Norbert said that Peggy had distributed a flyer, by way of mass mailing to his place of employment, accusing Norbert of being unfaithful.  (*Id.* ¶ 7.)  Norbert provided Detective Koehnke with the e-mails, the flyer, and one of the allegedly threatening letters.  (*Id.* ¶ 9.)  Detective Koehnke then had Nobert complete a Domestic Violence Victim's Statement form.  (*Id.* ¶ 8.)  Based on the information Norbert provided, Detective Koehnke prepared a

---

[3] To avoid confusion in the discussion of the factual background, the Court will use Norbert and Peggy Tencza's first names.

Also, Peggy purports to dispute the facts surrounding Norbert's initial police report to Detective Koehnke, although Peggy does not offer any admissible evidence to support that dispute.  However, whether Peggy disputes the facts surrounding Norbert's initial report to Detective Koehnke is of no consequence to the determination of Defendants' Motion for Summary Judgment because Peggy clarifies in her Response that her claims against Detective Koehnke do not relate to Detective Koehnke's actions in the domestic violence case that arose out of Norbert's initial report.  (Resp. at 2.) Therefore, the Court includes the facts surrounding Norbert's August 2, 2006 report merely for contextual purposes.

criminal complaint and summons charging Peggy with harassment under NMSA 1978 §
30-3A-2. (*Id.* ¶ 10.) The criminal complaint was filed on August 14, 2006. (Koehnke
Aff., Ex. 3.)

It appears that based on the police report and criminal complaint Norbert filed a
Petition for Order of Protection ("Petition") against Peggy on October 18, 2006. (*See*
October 25, 2006 Minute Order by Judge Nan Nash, attached to Mot. Summ. J. as Ex.
G.) On October 25, 2006, Norbert and Peggy appeared for a hearing on Norbert's
Petition before the Honorable Nan Nash in the Second Judicial District Court in
Albuquerque, New Mexico. (*See id.*) At the conclusion of the hearing, Judge Nash
issued a Minute Order in case number DV-2004-718[4] finding that "having heard
testimony, offers of proof[,] and argument . . . [t]he Court finds no probable cause to
conclude that an act of domestic violence has occurred." (*Id.*) Accordingly, Judge Nash
concluded that "the Petition for Order of Protection filed October 18, 2006 should be
dismissed." (*Id.*) However, at the bottom of the Minute Order, Judge Nash ordered that
"[Peggy] shall not contact [Norbert] or his wife or co-workers unless in case of
emergency. Other contact may be found to be harassment." (*Id.*) Judge Nash signed
this Minute Order as did Peggy's attorney, Maria Garcia Geer. (*Id.*)

Nearly one year lapsed between the entry of Judge Nash's Minute Order and the

---

[4] It appears that DV-2004-718 was used as a standing case number for Peggy and
Norbert's domestic violence allegations against one another. (*See* Memorandum Order
by Second Judicial District Court Judge Elizabeth Whitefield, attached to Mot. Summ. J.
as Ex. H.) Judge Nash's Minute Order also lists case number DM-2004-1765, (*see* Mot.
Summ. J., Ex. G), which pertains to Peggy and Norbert's divorce action that commenced
almost simultaneously with the first domestic violence case that generated the DV-
2004-718 case number. (*Id.*, Ex. H.) Judge Nash's inclusion of the DM-2004-1765 case
number in her Minute Order was ostensibly only for informational purposes. (*Id.*)

next incident giving rise to Peggy's claims in this case.  On September 4, 2007, APD

Officer Zazza Green responded to a call from Heights Cumberland Presbyterian Church

regarding an alleged violation of a no contact order.  (Green Aff. ¶¶ 2, 4 attached to Mot.

Summ. J. as Ex. B.)  Once at the scene, Officer Green  spoke with Norbert who alleged

that while he was waiting for his daughter in the foyer of the church building, Peggy

entered the building and walked up to Norbert.  (*Id.* ¶ 6.)[5]  Additionally, Norbert

_____

[5]In her Response, Plaintiff seemingly indicates that she disputes the Defendants'
statements of fact regarding this encounter.  (*See* Resp. at 3.)  Plaintiff does not
specifically state that she disputes those facts, but rather claims "Plaintiff was not
allowed to depose Officer Green in the limited discovery allowed by this Court.
However, the Affidavit of Peggy Tencza controverts statements of Norbert Tencza
contained in the Affidavit of Officer Green."  (*Id.*)  The Court initially notes that it is
common practice to stay discovery during the pendency of motions for summary
judgment based on qualified immunity.  Indeed, as the Honorable Lorenzo F. Garcia,
United States Magistrate Judge, indicated in the Order Staying Discovery, the United
States Supreme Court has held that once a defendant files a motion for summary
judgment based on qualified immunity, the defendant is entitled to a stay of discovery.
(Order Staying Discovery, Doc. No. 16)(citing *Saucier v. Katz*, 533 U.S. 194, 200-202
(2001) *overruled on other grounds by Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808
(2009)).  Furthermore, Judge Garcia explicitly informed Plaintiff that if Plaintiff felt she
needed additional discovery to respond adequately to Defendants' Motion for Summary
Judgment, then she could file an affidavit under Fed. R. Civ. P. 56 (f) with Judge Garcia
for his review to determine whether limited discovery would be made available.  (Order
Staying Discovery at 3-4.)  Thus, Plaintiff was not left without a remedy if she felt that
she lacked sufficient information to respond to Defendants' Motion for Summary
Judgment.  To date, Plaintiff has not filed an affidavit under Fed. R. Civ. P. 56 (f).
Instead, on June 23, 2009, Plaintiff filed Plaintiff's Unopposed Motion for Limited
Discovery Depositions of Officers Johnny Yara, Holly Stephenson, and Bruce Werley, Sr.
and Request to File Plaintiff's Response to Summary Judgment Within Fifteen (15) Days
of Completion of Depositions (Doc. No. 18), which Judge Garcia granted in his Order
Granting Plaintiff's Motion for Limited Depositions of Officers Yara, Stephenson, and
Werley (Doc. No. 20).  Plaintiff never requested the opportunity to depose Officer
Green.  While Plaintiff may have desired more discovery before briefing the issues
related to Defendants' immunity defenses, that desire is an insufficient basis to dispute a
statement of material fact in a motion for summary judgment.

Furthermore, Plaintiff's apparent attempt to dispute a statement of material fact
by seeking to re-litigate the factual allegations in Officer Green's report represents a
fundamental misunderstanding of the mechanics of summary judgment.  Those issues
have already been adjudicated and are not relevant to the Court's analysis here. The
essential inquiry here is whether the individual Officers' conduct violated Plaintiff's
constitutional rights, and, if so, whether it was clearly established at the time of the
various incidents that the Officers' conduct was unconstitutional.  *See Pearson v.
Callahan*, ___ U.S. ___, 129 S. Ct. 808, 815-16 (2009).  Thus, it is not the Court's role in
ruling on Defendants' Motion for Summary Judgment to determine the veracity of
Norbert Tencza's allegations.

claimed that although he left the area to avoid conflict, Peggy and her boyfriend stood

outside the foyer and looked through the glass at Norbert and his daughter before

eventually leaving. (*Id.* ¶¶ 7, 9.) After speaking with Norbert, Officer Green confirmed

that a "no contact" order was still in effect and prepared a police report "for

informational purposes to document [Green's] conversation with [Norbert]." (*Id.* ¶ 11.)

Officer Green did not speak with, arrest, or file a criminal complaint against Peggy. (*Id.*

¶ 12.)

On September 26, 2007, just over three weeks later, Norbert went to the APD

Southeast Substation to file another police report. (*See* Garcia Aff. ¶¶ 3-4, attached to

Mot. Summ. J. as Ex. C.) On this occasion, Norbert met with APD Detective Holly

Garcia. (*Id.* ¶¶ 2-4.) [6] During that meeting, Norbert claimed that Peggy had harassed

---

[6] Once again, Plaintiff does not explicitly dispute Defendants' statements of
material fact related to this encounter, but instead provides a lengthy summary of
Detective Garcia's deposition testimony in an apparent attempt to undermine the
credibility of Detective Garcia's sworn statements in her affidavit, a tactic Plaintiff also
employs with respect to the affidavits of Officers Yara and Worley, Sr. (*See* Resp. at 3-
8.) It is well-settled, however, that "it is not [the Court's] province at the summary
judgment stage to weigh evidence or make credibility determinations." *Sanders v. Sw.
Bell Tel., L.P.*, 544 F.3d 1101, 1105-06 (10th Cir. 2008). Accordingly, whatever bearing
Plaintiff's summary of the various Officers' deposition testimony may have on the issue
of those Officers' credibility is not relevant to the Court's analysis of Defendants' Motion
for Summary Judgment. Furthermore, as Defendants correctly note, under D.N.M.LR-
Civ. 56.1 (b),

> A memorandum in opposition to the motion [for summary judgment]
> must contain a concise statement of the material facts as to which the
> party contends a genuine issue does exist. Each fact in dispute must be
> numbered, must refer with particularity to those portions of the record
> upon which the opposing party relies, and must state the number of the
> movant's fact that is disputed. All material facts set forth in the statement
> of the movant will be deemed admitted unless specifically controverted.

To the extent that Plaintiff's summary of the Officers' deposition testimony can be
construed as an attempt to establish the existence of a genuine issue of material fact,
Plaintiff's effort in this regard lacks the specificity required by the Local Rules of Civil
Procedure and is therefore insufficient to controvert the properly supported statements
of material fact in Defendants' Motion for Summary Judgment. Thus, because Plaintiff
has adopted this inappropriate tactic in an ostensible effort to dispute Defendants'
statements of fact numbers 10 through 42, the Court will deem each of those facts
admitted by Plaintiff.

him by allegedly violating a no contact order the day before on September 25, 2007.
(Garcia Aff. ¶¶ 5, 10.)  Norbert also informed Detective Garcia that he had previously
filed a report with Officer Green regarding a similar incident on September 4, 2007.
(*See id.* ¶¶ 6, 8-9.)  Detective Garcia verified that Norbert had filed a report with Officer
Green and confirmed the existence of a no contact order with NCIC.  (*Id.* ¶¶ 7, 9; Garcia
Dep. 15:4 - 16:7, attached to Resp. as Ex. A.)  As Detective Garcia later testified in her
deposition, NCIC merely confirms the existence of a valid order of protection and does
not specify the individual that the order is intended to protect.  (*See* Garcia Dep. 16:2-
17.)  According to Detective Garcia, when officers call in to verify the existence of a valid
order of protection they initially identify the petitioner and respondent and do not later
re-verify those parties' identities after receiving confirmation from NCIC that a
particular order is valid.  (*Id.* at 16:10-17.)  Consequently, Detective Garcia did not
inquire further about the order of protection that Norbert had referenced after receiving
confirmation from NCIC that the order was still in effect.  (*Id.* at 16:8-17:9.)  Thus, based
on the information she acquired from her meeting with Norbert, Detective Garcia
prepared a criminal complaint and summons charging Peggy under NMSA 1978 § 40-
13-6 (e) with violating a restraining order.  (Garcia Aff. ¶ 12.)  Detective Garcia did not
meet with Peggy before filing the criminal complaint.  (*Id.* ¶ 13.)

        On December 3, 2007, Norbert once again visited the APD Southeast Substation
to file a police report.  (*See* Yara Aff. ¶¶ 2-3, attached to Mot. Summ. J. as Ex. D.)  APD
Detective Johnny Yara met with Norbert to take the report.  (*Id.* ¶ 2.)  Norbert claimed
that Peggy had violated a no contact order by approaching Norbert following an
orchestra concert in which Norbert and their daughter had performed.  (*Id.* ¶¶ 5-6.)

Norbert presented Detective Yara with an order of protection bearing case number DV-2004-718 (*id.* ¶ 7), which identified the Petitioner as Norbert Tencza and the Respondent as Peggy Tencza (Non-Mutual Order of Protection, attached to Resp. as Ex. F).  Detective Yara then contacted NCIC and verified that an order of protection in case number DV-2004-718 was still in effect.  (Yara Aff. ¶ 8.)  As Peggy correctly notes in her Response to the Defendants' Motion for Summary Judgment, the order that Norbert presented to Detective Yara is intended to protect Peggy, even though she is listed as the Respondent.  (*See* Resp. at 5; Resp., Ex. F.)  However, as Detective Yara later testified at his deposition, when officers contact NCIC to verify the existence of a valid order of protection, the only information they receive is the name of the Petitioner, the name of the Respondent, and whether a valid order exists in the particular case about which the officer is calling.  (Yara Dep. 19:24-20:1, attached to Resp. as Ex. E.)  In other words, NCIC does not specifically identify the party the order is intended to protect, and it is not common practice for officers to inquire further regarding the details of the order.  (*Id.* at 19:24-20:11.)  Based on Norbert's statement and the NCIC verification, Detective Yara prepared a criminal complaint and summons charging Peggy under NMSA 1978 § 40-13-6 (e) with violating a restraining order.  (Yara Aff. ¶ 9.)  Detective Yara did not meet with Peggy before filing the criminal complaint.  (*Id.* ¶ 10.)

Coincidentally, the Acting Sergeant on December 3, 2007 was Detective Koehnke, who reviewed the criminal complaint that Detective Yara prepared to verify that the facts alleged in the complaint satisfied the elements of the crime charged. (Koehnke Aff. ¶ 14.)  After conducting that review, Detective Koehnke signed the criminal complaint. (*Id.* ¶ 16.)  Because Detective Yara was the investigating officer, Detective Koehnke did not meet with either Norbert or Peggy before signing the complaint. (*Id.* ¶¶ 15, 17.)

8

On January 18, 2008, after reviewing briefing on Peggy's Motion to Extend Domestic Violence Order and Set Aside No Contact Order, the Honorable Elizabeth E. Whitefield, Second Judicial District Court Judge, issued a Memorandum Order concluding that Judge Nash's Minute Order entered October 18, 2006 was void *ab initio*. (Memorandum Order, attached to Mot. Summ. J. as Ex. H.)  Specifically, Judge Whitefield held that because Judge Nash had not found probable cause that domestic abuse had occurred, Judge Nash lacked "jurisdiction and authority to grant an order of protection restraining a party." (*Id.*)  Accordingly, Judge Whitefield concluded that Judge Nash's order was void both as an order of protection under the Domestic Violence Act and as a civil restraint. (*Id.*)

Approximately two months after Judge Whitefield issued her ruling, Peggy's criminal defense attorney, Natalie Bruce, who is also one of her attorneys in this case, sent a letter dated March 12, 2008 to APD Chief Ray Schultz, Second Judicial District Attorney Carrie [sic][7] Brandenburg, two APD Detectives in the Domestic Violence Unit, and a victim's advocate voicing concern over the manner in which the respective offices had handled Norbert's allegations against Peggy and the resulting prosecutions. (Letter from Natalie Bruce, attached to Resp. as Ex. C.)  Additionally, Ms. Bruce requested that the respective offices:

> investigate accusations by Norbert Tencza before initiating a criminal case. Call the individuals he lists as having information — if he doesn't offer persons with knowledge ask him who can corroborate his allegations.  Get some facts beyond his incredible statements.  Do the most basic tasks that are part of being a law enforcement officer and assistant district attorney . . ..

_____

[7] The actual name of the Second Judicial District Attorney is Kari Brandenburg.

9

(*Id.*)  In response to Ms. Bruce's letter, Chief Schultz checked into the existence of any reports relating to Peggy and Norbert Tencza.  (Schultz Aff. ¶ 3.)  As a result of that inquiry, Chief Schultz learned of the almost two year history of reports regarding "domestic issues" between Peggy and Norbert.  (*Id.* ¶ 4.)

On April 2, 2008, before Chief Schultz had responded to Ms. Bruce's letter, Norbert went to the APD Southeast Substation to file another police report.  (Werley Aff. ¶¶ 2-3.)  APD Officer Bruce Werley, Sr. met with Norbert on that occasion.  (*Id.*)  In his meeting with Officer Werley, Norbert alleged that he had received harassing phone calls from Peggy and her attorney, Natalie Bruce.  (*Id.* ¶ 4.)  Additionally, Norbert provided Officer Werley with "court documents and e-mails."  (*Id.* ¶ 6.)  Officer Werley instructed Norbert to complete a written statement (*see* Statement, attached to Mot. Summ. J. as Ex. E-1) and forwarded that statement, along with the other information Norbert provided, to the APD Stalking Unit for further investigation.  (Werley Aff. ¶¶ 5, 7.)  During his inquiry, Chief Schultz learned of this ongoing investigation and elected not to interfere with the investigation.  (Schultz Aff. ¶¶ 5-6.)

Then, by a letter dated April 28, 2008, Chief Schultz responded to Ms. Bruce's March 12, 2008 letter.  (*Id.* ¶ 7.)  In his April 28, 2008 letter, Chief Schultz apprised Ms. Bruce of his inquiry and of the ongoing investigation stemming from Norbert's April 2, 2008 report.  (*Id.*)  Specifically, Chief Schultz stated that,

> [t]he Albuquerque Police Department takes domestic disputes very seriously.  Officers are fully trained to investigate domestic cases thoroughly.  I understand that domestic cases are often very emotional to the persons involved.  In reviewing reports taken by officers of the Albuquerque Police Department over the past two years it is evident that there is a history of domestic issues between your client and Norbert Tencza.  The case that is currently active has been forwarded to our Family Abuse and Stalking Team (FASTT) for further investigation.

(Letter from Chief Schultz to Natalie Bruce, attached to Mot. Summ. J. as Ex. F-1.)  The record does not indicate that Ms. Bruce and Chief Schultz exchanged any additional correspondence.

On May 7, 2008, the Stalking Unit informed Officer Werley that they would not pursue felony charges based on the information Norbert provided, and advised Officer Werley to issue a misdemeanor summons instead.  (Werley Aff. ¶ 9.)  Officer Werley did so, issuing a criminal complaint and summons to Peggy charging her with harassment under NMSA 1978 § 30-20-12.  (*Id.* ¶ 10.)  Officer Werley did not meet with Peggy before issuing the criminal complaint and summons.  (*Id.* ¶ 11.)  However, on June 16, 2008, after meeting with Peggy's attorney and learning that the documents supporting the harassment charge "had already been adjudicated in another criminal proceeding," Officer Werley voluntarily dismissed the summons.  (*Id.* ¶ 12; *see also* Notice of Dismissal, attached to Mot. Summ. J. as Ex. E-3.)

During the two year period in which these events transpired, Chief Schultz never met Peggy nor did he initiate any charges or sign or file any criminal complaints against her.  (Schultz Aff. ¶¶ 9-11.)  Likewise, Chief Schultz did not instruct any officers to initiate any charges against Peggy. (*Id.* ¶ 8.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and [] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). When applying this standard, the Court examines "the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1273 (10th Cir.

2005) (citation omitted). "Summary judgment is appropriate if the non-moving party cannot adduce probative evidence on an element of its claim upon which it bears the burden of proof." *Id.* (citation omitted). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation omitted). "Unsupported conclusory allegations, however, do not create an issue of fact," *id.* (citation omitted); neither does "evidence, including testimony, . . . based on . . . mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citation omitted). Likewise, "the party opposing summary judgment may not rest on the averments or denials of its pleadings," but rather must go beyond the pleadings to show a genuine issue for trial. *Gonzales v. Millers Cas. Ins. Co. of Tex.*, 923 F.2d 1417, 1419 (10th Cir. 1991). However, "it is not [the Court's] province at the summary judgment stage to weigh evidence or make credibility determinations." *Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105-06 (10th Cir. 2008).

## QUALIFIED IMMUNITY STANDARD

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808, 815 (2009)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))(internal quotation marks omitted). "Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 129 S.Ct.

at 815.  With respect to the latter interest, the United States Supreme Court has

emphasized that qualified immunity is "an immunity from suit rather than a mere

defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) and has "repeatedly

stressed the importance of resolving immunity questions at the earliest possible stage in

litigation" to avoid subjecting government officials to the costs and burdens of litigation

unnecessarily, *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)(per curiam).

The analysis of a government official's entitlement to qualified immunity follows

a two-step approach.  In the context of a motion for summary judgment, the Court first

"must decide whether the facts that a plaintiff has . . . shown . . . make out a violation of

a constitutional right."  *Pearson*, 129 S. Ct. at 815-16.  "[I]f the plaintiff has satisfied this

first step, the court must [then] decide whether the right at issue was clearly established

at the time of defendant's alleged misconduct."  *Id.* at 816 (internal citation and

quotation marks omitted).  Under the approach recently articulated in *Pearson*, the

Court may exercise its discretion "in deciding which of the two prongs of the qualified

immunity analysis should be addressed first in light of the circumstances in the

particular case at hand."  *Id.* at 818.

## DISCUSSION

Defendants move for summary judgment, albeit in a less than clear fashion,[8]  on

Plaintiff's federal constitutional claims under the First, Fourth, and Fourteenth

Amendments, on Plaintiff's state constitutional claims, and on Plaintiff's purported state

---

[8] In certain instances, Defendants move for summary judgment on some of
Plaintiff's claims in brief footnotes.  While the Court will consider those arguments,
Defendants' counsel is admonished that raising substantive arguments via passing
references in footnotes is strongly disfavored.

law tort claims against the individual Defendants.  After reviewing Plaintiff's Amended
Complaint (Doc. No. 24), the Court has determined that Plaintiff has dropped the state
tort law claims presented in her original Complaint (Doc. No. 1, Ex. 1), and the Court,
therefore, declines to address the merits of claims no longer present in this case.  With
respect to each of Defendants' arguments regarding the remaining claims, the Court will
address those arguments separately.  The Court will begin its discussion by examining
Defendants Koehnke, Green, Garcia, and Yara's argument that they are entitled to
quasi-judicial immunity.

**I.       Defendants Koehnke, Green, Garcia, and Yara's Claim to Quasi-Judicial Immunity**

Defendants Koehnke, Green, Garcia, and Yara move for summary judgment on
all of Plaintiff's claims arguing that they are entitled to quasi-judicial immunity.  In
support of that argument, Defendants Koehnke, Green, Garcia, and Yara rely on a
provision on the New Mexico Family Violence Protection Act, which provides in
pertinent part that "[a]ny law enforcement officer responding to a request for assistance
under the Family Violence Protection Act is immune from civil liability to the extent
allowed by law."  NMSA 1978 § 40-13-7 (D).  In that vein, Defendants Koehnke, Green,
Garcia, and Yara argue that they are entitled to quasi-judicial immunity because in
issuing the criminal summonses about which Plaintiff complains, they were merely
enforcing Judge Nash's no contact order, and as such are immune from liability.

Plaintiff responds by arguing that Defendants Koehnke, Green, Garcia, and Yara's
claimed entitlement to quasi-judicial immunity "turn[s] the facts on their head . . .."
(Resp. at 19.)  Specifically, Plaintiff contends that to invoke quasi-judicial immunity,

Defendants Koehnke, Green, Garcia, and Yara are required to show that at the time they issued the criminal summonses, they had personal knowledge that the order they were enforcing was facially valid.  Plaintiff maintains none of the Defendants can make that showing.  Instead, Plaintiff argues that the Officers' reliance on NCIC to confirm the existence of the order was absurd and does not entitle them to invoke quasi-judicial immunity.

### A.    Law Governing Absolute and Quasi-Judicial Immunity

"Immunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches. Consequently, immunity which derives from judicial immunity may extend to persons other than a judge where performance of judicial acts or activity as an official aid of the judge is involved."  *Whitesel v. Sengenberger*, 222 F.3d 861, 867 (10th Cir. 2000)(internal citations, quotation marks, and alterations omitted).  Thus, "[j]ust as judges acting in their judicial capacity are absolutely immune from liability under section 1983, officials charged with the duty of executing a facially valid court order enjoy absolute immunity from liability for damages in a suit challenging conduct prescribed by that order."  *Turney v. O'Toole*, 898 F.2d 1470, 1472 (10th Cir. 1990)(internal citations, alterations, and quotation marks omitted); *see also Moss v. Kopp*, 559 F.3d 1155, 1163 n.9 (10th Cir. 2009)(noting that "[t]he 'absolute immunity' available to individuals executing a court order is also sometimes alternatively referred to as 'quasi-judicial immunity.'")(citation omitted).  However, it is important to note that "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties."  *Stein v. Disciplinary Bd. of Sup. Ct. of N.M.*, 520 F.3d 1183, 1191 (10th Cir. 2008)

15

(quoting *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 432 n. 4(1993)).  Likewise,

"[a]bsolute immunity is not available simply because one's work is functionally part and

parcel of the judicial process."  *Id.* (quoting *Antoine*, 508 U.S. at 432).  Hence, the

United States Supreme Court has "been quite sparing in [its] recognition of absolute

immunity, and ha[s] refused to extend it any further than its justification would

warrant."  *Antoine*, 508 U.S. at 432 n. 4.

Whether a court order is facially valid is not determined by examining whether

the order comports with state law.  *Turney*, 898 F.2d at 1473.  To the contrary, the

Tenth Circuit Court of Appeals has explicitly held that "[f]acially valid does not mean

lawful.  An erroneous order can be valid."  *Id.*  Indeed, the Tenth Circuit has explained

that:

> "State officials 'must not be required to act as pseudo-appellate courts
> scrutinizing the orders of judges,' but subjecting them to liability for
> executing an order because the order did not measure up to statutory
> standards would have just that effect." *Id.* (quoting *Valdez*, 878 F.2d at
> 1289. Further, "[t]o allow plaintiffs to bring suit any time a state agent
> executes a judicial order which does not fulfill every legal requirement
> would make the agent 'a lightning rod for harassing litigation aimed at
> judicial orders.'" *Id.* (quoting *Valdez*, 878 F.2d at 1289). "Simple fairness
> requires that state officers 'not be called upon to answer for the legality of
> decisions which they are powerless to control.'" *Id.* (quoting *Valdez*, 878
> F.2d at 1289).
> We have also noted that a narrow conception of facial validity would
> deprive the court of most of the benefit it derives from the existence of
> quasi-judicial immunity for officers carrying out its orders because the
> unhesitating execution of court orders is essential to the court's authority
> and ability to function, and state officers subject to litigation might neglect
> to execute these orders. *Turney*, 898 F.2d at 1473. Even worse, "'a fear of
> bringing down litigation on the [officer executing the order] might color a
> court's judgment in some cases.'" *Id.* (quoting *Kermit Constr. Corp. v.
> Banco Credito Y Ahorro Ponceno*, 547 F.2d 1, 3 (1st Cir. 1976)). In short,
> "'[t]he public interest demands strict adherence to judicial decrees.'" *Id.* at
> 1473-74 (quoting *Valdez*, 878 F.2d at 1289).

*Moss*, 559 F.3d at 1164-65.

Nevertheless, the "unquestioning execution of a judicial directive" is not necessarily a free pass to immunity from suit. *Turney*, 898 F.2d at 1472. Accordingly, "for the defendant state official to be entitled to quasi-judicial immunity, the judge issuing the disputed order must be immune from liability in his or her own right, the officials executing the order must act within the scope of their own jurisdiction, and the officials must only act as prescribed by the order in question." *Moss*, 559 F.3d at 1163; *see also id.* (observing that "a judge does not act in the clear absence of all jurisdiction even if the action he took was in error, was done maliciously, or was in excess of his authority."). With regard to the latter requirement, the Tenth Circuit has been careful to note, however, that "quasi-judicial immunity extends only to acts prescribed by the judge's order. Therefore, absolute immunity does not protect defendants from damage claims directed not to the conduct prescribed by the court order itself, but to the manner of the order's execution." *Id.* at 1167 (citations omitted).

### B.   Whether Defendants Koehnke, Green, Garcia, and Yara are Entitled to Quasi-Judicial Immunity

While at first blush it is tempting to presume that the doctrine of quasi-judicial immunity applies to the facts of this case, a closer analysis reveals that the application of this doctrine is best saved for circumstances not present here. Although the Court's analysis is complicated by the parties', and particularly Defendants', failure to address each of the factors required to justify an award of quasi-judicial immunity, this failure is ultimately of little consequence because the central issue here is whether Defendants Koehnke, Green, Garcia, and Yara acted as prescribed by Judge Nash's Minute Order, a factor on which the Court has sufficient information. However, before reaching that

factor, the Court will briefly address the other two factors in the quasi-judicial immunity analysis.

First, in accordance with *Moss*, Defendants Koehnke, Green, Garcia, and Yara must show that Judge Nash would be entitled to immunity in her own right for issuing the October 25, 2006 Minute Order. *Id.*, 559 F.3d at 1163. Under the law governing judicial immunity, it is clear that "[j]udges are absolutely immune from civil liability for judicial acts, unless committed in the clear absence of all jurisdiction. A judge does not act in the clear absence of all jurisdiction even if the action he took was in error, was done maliciously, or was in excess of his authority. Moreover, a judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors." *Whitesel*, 222 F.3d at 867 (internal citations and quotation marks omitted). Thus, even though Judge Whitefield ultimately concluded that Judge Nash lacked jurisdiction to issue a no contact order (*see* Mot. Summ. J., Ex. H), nothing in Judge Whitefield's Memorandum Order or in the record now before the Court suggests that Judge Nash acted in the clear absence of jurisdiction. To the contrary, Judge Whitefield's Memorandum Order merely provides that Judge Nash committed a procedural error in issuing a no contact order after finding no probable cause that domestic violence had occurred. (*Id.*) Because a procedural *faux pas* is not a ground on which to base a claim against a judicial officer, Judge Nash would be absolutely immune from liability for including a no contact order in the October 25, 2006 Minute Order.

Second, Defendants Koehnke, Green, Garcia, and Yara must demonstrate that they acted within the scope of their own jurisdiction. *Moss*, 559 F.3d at 1163. Neither

18

party specifically addressed this element in the briefing.  Hence, the Court must conduct

its own analysis based on the record presented and considering the facts in the light

most favorable to Plaintiff. Viewed in that light, the facts establish that: (1) Officer Green

and Detectives Garcia and Yara each took a report from Norbert and contacted NCIC to

determine whether a valid no contact order existed for the case number provided, (2)

Detectives Garcia and Yara each filed a criminal complaint and summons based on the

information gathered from Norbert and their contact with NCIC, and (3) Detective

Koehnke, as Acting Sergeant at the APD Southeast Substation, signed the criminal

complaint that Detective Yara prepared.  Taking reports, verifying information with

NCIC, and filing criminal complaints all fall squarely within the duties of law

enforcement officers in New Mexico and thus are within their jurisdiction.  *See* NMSA

1978 § 29-1-1 ("It is hereby declared to be the duty of every sheriff, deputy sheriff,

constable and every other peace officer to investigate all violations of the criminal laws

of the state which are called to the attention of any such officer or of which he is aware,

and it is also declared the duty of every such officer to diligently file a complaint or

information, if the circumstances are such as to indicate to a reasonably prudent person

that such action should be taken, and it is also declared his duty to cooperate with and

assist the attorney general, district attorney or other prosecutor, if any, in all reasonable

ways."); *see also* NMSA 1978 § 40-13-7 (B)(1) (stating that a law enforcement officer

responding to a request for assistance concerning domestic violence "shall be required

to take whatever steps are reasonably necessary to protect the victim from further

domestic abuse, including: (1) advising the victim of the remedies available under the

Family Violence Protection Act; the right to file a written statement, a criminal

complaint and a request for an arrest warrant; and the availability of domestic violence shelters, medical care, counseling and other services . . ..").  Accordingly, the Court concludes that Defendants Koehnke, Green, Garcia, and Yara were each acting within the scope of their jurisdiction when they took the actions now at issue.

Third, and most important to this case, Defendants Koehnke, Green, Garcia, and Yara must establish that they acted as prescribed by Judge Nash's October 25, 2006 Minute Order, the court order on which they claim to have relied.  *Moss*, 559 F.3d at 1163. Defendants Koehnke, Green, Garcia, and Yara each characterize their respective actions as "enforcement of a court directive," and accordingly maintain that because they were enforcing a court directive they are entitled to quasi-judicial immunity. However, both the characterization of their actions and the logic of their argument is overly simplistic and does not accurately reflect the facts of the case or the applicable law.  As the Tenth Circuit has made clear, "quasi-judicial immunity extends only to acts prescribed by the judge's order," *id.* at 1167, and thus the specific language of the order on which the official claiming immunity relied is particularly important.  The relevant portion of Judge Nash's Minute Order provides that "[Peggy] shall not contact [Norbert] or his wife or co-workers unless in case of emergency.  Other contact may be found to be harassment." (Mot. Summ. J., Ex. G.)  Noticeably absent from that language is any specific directive to a law enforcement agency to take action in accordance with the order.  It is thus difficult for Defendants Koehnke, Green, Garcia, and Yara now to claim that they acted to enforce a court directive when no directive actually exists in the Minute Order.  Furthermore, it is important to note that none of the Defendants in either their affidavits or in the excerpts of their deposition testimony provided to the

Court claim to have relied on the specific language of or a particular directive in Judge

Nash's Order.  Rather, they only claim to have acted in reliance on the information

obtained from NCIC.  While such reliance may be properly raised in the context of

qualified immunity, to afford Defendants Koehnke, Green, Garcia, and Yara quasi-

judicial immunity based on a third party's confirmation of the existence of a court order

would impermissibly extend the doctrine of quasi-judicial immunity beyond its

narrowly circumscribed limits.  Therefore, the Court finds that Defendants Koehnke,

Green, Garcia, and Yara's motion for quasi-judicial immunity should be denied.

## II.      The Nature of Plaintiff's First Amendment Claim

Defendants move for qualified immunity on Plaintiff's claim that Defendants

violated her right to free speech under the First Amendment.[9]  Initially, Defendants

argue that the allegation of Plaintiff's First Amendment claim is conclusory and lacks

factual support.  In that vein though, Defendants argue that to the extent Plaintiff has

alleged facts that could give rise to a claim under the First Amendment, those facts do

not establish the elements required to state a cognizable claim.  Specifically, Defendants

maintain that because Defendants did not employ Plaintiff or enter into a contractual

---

[9] While Plaintiff has also asserted in her Amended Complaint that Defendants violated her right to freedom of association, (Doc. No. 24 at 11), she did not clarify the specific nature of that claim or state the constitutional amendment on which she based that claim.  However, taking into account the arguments presented in Plaintiff's Response to Defendants' Motion for Summary Judgment (*see* Resp. at 14-15), the Court construes Plaintiff's allegations in her Amended Complaint, as refined by the arguments in her Response, as a putative claim for violation of her right to familial and intimate association.  This would be a claim under the Fourteenth Amendment, but it does not invoke the First Amendment, which protects expressive association. *Trujillo v. Bd. of County Commr's of Santa Fe County*, 768 F.2d 1186, 1188-89 (10th Cir. 1985).  Because Defendants have not addressed Plaintiff's freedom of association claim, the Court declines to do so here.

relationship with her, Plaintiff's claims are governed by the standard articulated in *Smith v. Plati*, 258 F.3d 1167, 1176 (10th Cir. 2001), which requires a plaintiff to prove that "(1) [s]he was engaged in constitutionally protected activity; (2) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."  Defendants argue that Plaintiff cannot satisfy the first element under that standard because she did not engage in protected speech toward any Defendant, and therefore cannot state a viable claim.  Additionally, Defendants contend that Plaintiff's claim should be governed solely by the Fourth Amendment, arguing that Plaintiff's "factual averments concern being charged with criminal offenses without probable cause via the issuance of criminal summonses." (Mot. Summ. J. at 11.)  Relying on *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality), Defendants maintain that the Fourth Amendment provides an explicit textual source of constitutional protection from the wrong complained of and should be the exclusive basis for Plaintiff's claims.

In response, Plaintiff argues that her affidavit filed in support of her Response establishes "not [as] a legal conclusion, but [as] a fact that [her] freedom of speech was reduced to zero relative to the facts of the pending criminal cases." (Resp. at 11.) Furthermore, Plaintiff asserts that her "affidavit further supports and clarifies that [she] did not have freedom to turn around to her peers, in the open courtroom, and state[,] "I did not do this - this man is lying . . .." (*Id.*)  Although Plaintiff acknowledges that she did not engage in that kind of speech at the direction of Ms. Bruce, who instructed

22

Plaintiff to remain silent in accordance with her Fifth Amendment right to do so, she argues that " it is common practice . . . that the criminal defense attorney effectively and persuasively places a gag order on the person while the case is pending." (*Id.* at 12.) Moreover, Plaintiff asserts that "Defendants effectively denied Plaintiff her freedom of speech . . . by not calling her, as an accused, to get her version and information, . . . [and allowing her] the opportunity to counter false accusations with her own speech." (*Id.*)

Additionally, Plaintiff disputes Defendants' reliance on *Smith v. Plati*, 258 F.3d 1167 (10th Cir. 2001), arguing that the standard articulated there is not applicable in this case because she is not asserting a claim for retaliation.  As Plaintiff explicitly states, "[n]owhere in Plaintiff's Complaint is there any factual or legal assertions that she engaged in protected speech [] and then faced retaliatory consequences." (Resp. at 13.) Accordingly, Plaintiff maintains that *Smith* is "totally inapplicable." (*Id.*)

Defendants reply that the "Court must be guided by the *Smith* decision as it clearly sets forth the requisite elements for a First Amendment claim when the defendant is not the employer or in a contractual relationship with the plaintiff." (Reply at 4.)  Additionally, with regard to whether Plaintiff engaged in protected speech, Defendants argue that they "have not unearthed any legal authority which holds that invocation of a Fifth Amendment right against self incrimination can be the premise of a First Amendment violation[,]" and add that "Defendants did not deprive Plaintiff of her freedom to speak in court; rather Plaintiff made that choice." (*Id.*)  Alternatively, Defendants argue that even if an individual's invocation of her Fifth Amendment rights could serve as the basis of a First Amendment claim, Plaintiff has failed to offer any evidence that Defendants' conduct "caused [] [P]laintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in protected speech or

that Defendants' filing of criminal charges was substantially motivated in response to []
Plaintiff's exercise of constitutionally protected conduct." (*Id.* at 5.) Therefore,
Defendants assert that Plaintiff's First Amendment claim fails as a matter of law.

### A.    The Law Applicable to Plaintiff's First Amendment Claim

Although Defendants maintain that the Fourth Amendment should govern
Plaintiff's claims exclusively, that argument is without merit.  To support their
argument, Defendants primarily rely on *Albright v. Oliver*, 510 U.S. 266 (1994), in
which the United States Supreme Court reiterated the principle that "[w]here a
particular Amendment provides an explicit textual source of constitutional protection
against a particular sort of government behavior, that Amendment, not the more
generalized notion of substantive due process, must be the guide for analyzing these
claims." *Id.* at 273 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  Notably,
the United States Supreme Court in that decision was addressing the situation where a
plaintiff seeks to use the somewhat amorphous principle of substantive due process as
the basis for asserting an alleged violation of a constitutional right explicitly conferred
by another constitutional amendment.  That situation is not present here.  Plaintiff has
unquestionably alleged that Defendants violated her right to free speech under the First
Amendment in addition to committing distinct violations of her rights under the Fourth
and Fourteenth Amendments.  (*See* Doc. No. 24 at 9-11.)  Therefore, Defendants'
reliance on *Albright* to support their argument in this regard is misplaced, and the Court
thus declines to limit Plaintiff's claims in the manner proposed by Defendants.

Additionally, despite Defendants' insistence that *Smith* should govern this case,
that insistence reflects an unduly narrow view of potential claims under the First

24

Amendment.  Neither *Smith* nor any other authority cited by Defendants stands for the proposition that a plaintiff is limited to a claim for First Amendment retaliation where she is not an employee of or in a contractual relationship with the defendant.  Indeed, the case law interpreting the First Amendment recognizes a broad array of potential claims, *see Weise v. Casper*, 593 F.3d 1163, 1168 (10th Cir. 2010),  and one in particular that is applicable to this case — prior restraint.  *See, e.g., Dixon v. Kirkpatrick*, 553 F.3d 1294 (10th Cir. 2009).  Plaintiff has made clear that she is not asserting a claim for retaliation, and instead is apparently pursuing the rather unorthodox theory that Defendants' effected a kind of prior restraint on her protected speech by issuing criminal summonses against her.  Thus, because the Court construes Plaintiff's First Amendment claim as alleging a type of prior restraint, the Court will apply the law governing prior restraints of speech to Plaintiff's First Amendment claim, recognizing the rather precarious fit of that law to this case.

"[U]nlike an adverse action taken in response to actual speech, [a prior restraint] chills potential speech before it happens. Typically, a prior restraint is a requirement that a speaker obtain government approval for her message in advance of publishing it — or, in rare cases, a 'gag order' targeted at particular speech."  *Dixon,* 553 F.3d at 1308 (citations omitted)(alterations in original).  Precisely because a prior restraint effectively prevents speech from occurring, "[a]ny prior restraint on expression comes . . . with a 'heavy presumption' against its constitutional validity."  *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558 (1976).

**B.      Whether Defendants Are Entitled to Qualified Immunity on Plaintiff's First Amendment Claim**

Turning now to Plaintiff's claim under the First Amendment, the Court, exercising its discretion under *Pearson*, 129 S. Ct. at 818, will first address whether the contours of Plaintiff's free speech rights were clearly established at the time the various Defendants' acted.  While Defendants have asserted qualified immunity largely based on an inapplicable standard, the Court notes that Plaintiff's Response does little to help her cause.  Remarkably, Plaintiff does not cite to a single case involving the First Amendment in the section of her Response concerning her First Amendment claim. Aside from violating the local rules of civil procedure,[10] Plaintiff's Response wholly fails to show that the contours of the relevant free speech rights were clearly established. Although Plaintiff's failure to carry her burden in this regard is likely sufficient on its own to warrant granting Defendants qualified immunity on this claim, the Court will nevertheless complete its qualified immunity analysis.

"[F]or a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Cortez v. McCauley*, 478 F.3d 1108, 1114-15 (10th Cir. 2007) (en banc) (internal citation and quotation marks omitted). However, "the qualified immunity doctrine does not require a case exactly on point. 'Clearly established' does not mean that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is

---

[10] D.N.M.LR-Civ. 7.3 (a) provides in pertinent part that "[a] motion, response or reply must cite authority in support of the legal positions advanced."

to say that in the light of pre-existing law the unlawfulness must be apparent." *Weise*, 593 F.3d at 1167 (internal citations and quotation marks omitted).  Defining the particular right at issue, then, becomes essential to assessing whether a defendant is entitled to qualified immunity.  "In qualified immunity cases, except in the most obvious cases, broad, general propositions of law are insufficient to suggest clearly established law." *Id.*  Thus, "a First Amendment claim must be situated somewhere within the free speech jurisprudence because [the courts] accord speech various levels of protection depending upon the nature of the speech, the speaker, and the setting." *Id.* at 1168.

Based on what the Court can discern from Plaintiff's vague legal allegations in her Amended Complaint and the rather tangential explanation of her claim in her Response, it appears that at the most general level Plaintiff is asserting a violation of her right to speak freely without prior governmental restraint.  (*See* Doc. No. 24 at 9, 11; Resp. at 11-13.)  However, such a broad proposition of law cannot be the starting point of the Court's analysis.  Thus, the Court will address the more specific inquiry of whether the law was clearly established that a government official's issuance of a criminal charging document constitutes an impermissible prior restraint on speech when the person allegedly restrained subsequently invokes her Fifth Amendment right against self-incrimination.  Similarly, the Court will examine whether the law was clearly established that a police officer's failure to take an accused's statement prior to issuing a criminal charging document constitutes an impermissible prior restraint on the accused's speech.

There does not appear to be any authority from either the United States Supreme Court or from any of the United States Circuit Courts of Appeal holding that either the issuance of a criminal charging document or the failure to take an accused's statement

constitutes an unconstitutional prior restraint on speech.  This may partially explain

Plaintiff's failure to cite any supporting authority for her claim.  The law in this area is

far from being clearly established.  Accordingly, Plaintiff cannot meet her burden of

showing that Defendants' conduct violated clearly established law.  Therefore, the Court

finds that Defendants are entitled to qualified immunity on Plaintiff's First Amendment

free speech claim.

The Court notes that even if it had broadly defined the right at issue, Plaintiff's

claim fails to state a violation of a constitutional right.  Plaintiff's allegation that

Defendants' issuance of criminal summonses "resulted in . . . prohibition from free

speech while [sic] criminal cases pending," (Doc. No. 24 at 9), represents a perverse and

legally unsupported application of the governing law.   The Fifth Amendment to the

United States Constitution, in part, protects an individual's right against self-

incrimination.  U.S. Const. amend. V.  Thus, a government official may not compel an

individual to be a witness against herself in a criminal proceeding.  *Id.*  However, it has

long been recognized that an individual may waive the Fifth Amendment right against

self-incrimination knowingly, voluntarily, and intelligently, *Miranda v. Arizona*, 384

U.S. 436, 444 (1966).  An individual is not compelled to remain silent simply because

the government has initiated criminal charges against her; rather, an accused individual

may invoke the right to remain silent in the face of government questioning or conduct

that could result in self-incrimination, or the individual may choose to waive that right

and speak.  *See Alston v. Redman*, 34 F.3d 1237, 1243-44, 1247 (3d Cir. 1993).  Of

course, if an individual elects to waive her right against self-incrimination, she then

faces the risk that any statements she utters may be used against her in court.

28

Accordingly, an individual's decision to waive her Fifth Amendment right against self-incrimination amounts to an individual cost-benefit analysis, and is a decision that the individual alone must ultimately make.  Thus, in deciding to remain silent, it is the individual's own conduct, likely based on the advice of her lawyer, that results in silence. Hence, the choice to refrain from speaking is not in response to an order, statute, or regulation attributable to a government official.

In this case, it is undisputed that Plaintiff chose to remain silent during her criminal proceedings in accordance with Ms. Bruce's advice.  While Plaintiff has claimed her decision not to speak in court is evidence of a *de facto* gag order, presumably imposed by Defendants, the record is entirely devoid of any evidence that any Defendant ordered Plaintiff not to speak or in any way curtailed her ability to waive her Fifth Amendment right to remain silent.  Instead, Plaintiff's argument in her Response clarifies that her decision to remain silent resulted from "effective[] and persuasive[]" advice of Ms. Bruce.  (Resp. at 12.)  Thus, nothing in the record suggests that Plaintiff's decision to remain silent was anything but a valid exercise of her rights under the Fifth Amendment, which no reasonable reading of the law would suggest constitutes a violation of the First Amendment.

Next, Plaintiff's claim that Defendants infringed on her right to free speech by "not calling her, as an accused, to get her version and information . . ." (Resp. at 12) is as legally deficient as the claim just discussed.  Plaintiff appears to argue that Defendants had an affirmative duty under the First Amendment to seek out Plaintiff for the purpose of allowing her to speak to them, an argument the Court construes as another erroneous attempt to invoke prior restraint jurisprudence.  Once again, Plaintiff has not offered

any evidence, and much less has not alleged, that any Defendant procured a gag order or that any order, statute, or regulation attributable to Defendants prohibited Plaintiff from speaking in any way.  To the extent Plaintiff contends that Defendants had a duty under the First Amendment to seek out statements from her, her argument reflects a misapprehension of the nature of the rights secured by the Constitution.  Indeed, as the Third Circuit Court of Appeals has aptly explained,

> The rights guaranteed by the Constitution of the United States are primarily negative in character, standing guard as vigilant sentinels at the perimeter of permissible state conduct. It is only at the time that the state seeks to invade this citadel of individual liberty that these constitutional guarantees can be summoned to battle. . . . The right of free speech, the right to be free from unreasonable searches and seizures, the right to be free from double jeopardy, the right to due process under the Fifth Amendment, all of these are framed as prohibitions on state conduct, rather than as commandments for state action.

*Alston*, 34 F.3d at 1247 (citations omitted).  Thus, contrary to Plaintiff's position, the First Amendment does not impose a duty on government officials to actively encourage speech; rather, the First Amendment places restrictions on the extent to which government officials can limit speech.  While Plaintiff may take issue with Defendants' investigative techniques, Defendants' failure to talk to Plaintiff does not constitute a violation of her rights under the First Amendment.  Accordingly, Defendants are entitled to qualified immunity on Plaintiff's First Amendment free speech claim.

### III.    Plaintiff's Malicious Prosecution Claim[11]

Next, Defendants move for qualified immunity on Plaintiff's malicious

prosecution claim.  While Plaintiff never explicitly articulated a claim for malicious

prosecution as such, a review of her Amended Complaint (Doc. No. 24 at 9-11) and her

arguments in her Response to Defendants' Motion for Summary Judgment (Resp. at 14-

17) reveals that she is attempting to assert a claim for malicious prosecution based on an

alleged violation of her rights under both the Fourth Amendment and the Fourteenth

Amendment Due Process Clause.  The Court's analysis of Plaintiff's malicious

prosecution claim is substantially complicated both by Defendants' disjointed

presentation of their arguments regarding this claim and by Plaintiff's failure to

articulate the nature of her claim clearly or to cite any authority, beyond that which

Defendants cite, in support of her arguments.  For purposes of clarity, the Court has

consolidated the parties' piecemeal arguments regarding this claim.

First, Defendants move for qualified immunity on the part of Plaintiff's malicious

prosecution claim that is based on an alleged violation of procedural due process,

asserting that Plaintiff's "factual averments do not support any such claim."  (Mot.

Summ. J. at 13.)  In support of that assertion, Defendants argue that the Tenth Circuit

has never permitted due process malicious prosecution claims where the plaintiff "has

not been imprisoned or confined."  (*Id.* at 14)(emphasis in original omitted).  Thus,

Defendants contend that because Plaintiff was not confined or convicted of any charge,

---

[11] As discussed in Part III.A *infra*, Defendants' reference to a Fourth Amendment claim is somewhat misleading, as Plaintiff's claim in this regard is apparently one for malicious prosecution, which involves both Fourth and Fourteenth Amendment principles.  *See Pierce v. Gilchrist*, 359 F.3d 1279, 1286 (10th Cir. 2004).  Because the parties' briefing on this issue is muddled and rather convoluted, the Court will refer broadly to Plaintiff's malicious prosecution claim instead of to the subcategories the parties briefed.

"it is doubtful that a procedural due process claim can exist under these circumstances." (*Id.*)  Alternatively, Defendants maintain that even if the facts of this case could give rise to a potentially cognizable due process malicious prosecution claim, the governing law is sufficiently ambiguous as to preclude Plaintiff from showing that Defendants violated clearly established law.

Later in their Motion for Summary Judgment, Defendants move for qualified immunity on Plaintiff's malicious prosecution claim based on an alleged violation of her Fourth Amendment rights, arguing that no seizure occurred from which Plaintiff could assert such a claim.  Despite acknowledging earlier that the principles of procedural due process sometimes apply to malicious prosecution claims, Defendants assert that "[a]ny such claim must be analyzed under the Fourth Amendment."  (Mot. Summ. J. at 16.)  In that regard, Defendants contend that although Plaintiff "alleges in her complaint that she was seized via criminal summonses[,] . . . the mere issuance of a criminal summons does not constitute a seizure."  (*Id.*)  Defendants argue, therefore, that Plaintiff's Fourth Amendment claim fails as a matter of law.

In response, Plaintiff compartmentalizes her argument into sections regarding procedural due process and the Fourth Amendment, but, with respect to the portions of those sections that relate to her malicious prosecution claim,[12] Plaintiff advances the same argument, *verbatim*, that "an initial seizure did occur in this case" on which she

---

[12] Plaintiff responded to Defendants' arguments regarding the part of her malicious prosecution claim based on a violation of procedural due process in a section entitled "Plaintiff Has Plead a Viable Fourteenth Amendment Claim."  (Resp. at 14.) This section of her Response appears to address more than just the merits of her malicious prosecution claim.  To the extent it does so, the Court will not address those issues in this section of the Memorandum Opinion and Order.

could base a viable malicious prosecution claim.  (Resp. at 16-17.)  As support for that

argument, Plaintiff asserts that, "[t]he Tenth Circuit[] recognizes the possibility that a

summons, coupled with additional liberty restrictions[,] such as travel restrictions and

requirements to attend court, are 'control' of the person and therefore may be a seizure."

(*Id.*)(citing *Becker v. Kroll*, 494 F.3d 904, 916 (10th Cir. 2007)).  According to Plaintiff,

the facts here support finding that Defendants seized Plaintiff by issuing criminal

summonses because she "was required to attend court multiple times, her travel was

restricted, her right to familial association was limited, and her right to associate freely

was limited."  (Resp. at 16-17.)  Thus, Plaintiff asserts that "the continuing limitations

and restrictions, and compelled court appearances, support a claim of a violation of her

rights pursuant to the Due Process Clauses of both federal and state constitutions."  (*Id.*

at 16.)  Furthermore, Plaintiff contends that "there is a legal theory and basis upon with

[sic] Plaintiff may recover under the current state of Fourth Amendment jurisprudence

and Section 1983 law in this circuit[, and] [t]herefore summary judgment is

inappropriate."  (*Id.* at 17.)

Defendants reply first by reiterating their argument that Defendants did not seize

Plaintiff by issuing criminal summonses.  Additionally, Defendants contend that

Plaintiff's Fourth Amendment claim "fails because each defendant officer who issued a

criminal summons did so because they had probable cause."  (Reply at 6.)  According to

Defendants, Plaintiff's allegations state, at most, a claim for negligence against

Defendants, which is not cognizable under § 1983.  Furthermore, Defendants argue that

their reliance on NCIC and the information provided by Norbert was not unreasonable

and was sufficient to establish probable cause to issue each criminal summons against

Plaintiff.  Therefore, Defendants assert that Plaintiff's malicious prosecution claim

based on issuance of the summonses fails as a matter of law.

>    **A.      The Law Governing Plaintiff's Malicious Prosecution Claim**

"[W]hen addressing § 1983 malicious prosecution claims, . . . the common law

elements of malicious prosecution [serve] as the starting point of [the] analysis . . .."

*Novitsky v. City of Aurora*, 491 F.3d 1244, 1257 (10th Cir. 2007)(internal quotation

marks omitted).  "The elements of the common law tort of malicious prosecution, as

applicable in a § 1983 claim, are: (1) the defendant caused the plaintiff's continued

confinement or prosecution; (2) the original action terminated in favor of the plaintiff;

(3) there was no probable cause to support the original arrest, continued confinement,

or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained

damages."  *Id.* at 1258.   While these common law elements unquestionably guide the

analysis, "the ultimate question is whether plaintiff has proven the deprivation of a

constitutional right."  *Id.* at 1257.  Thus, "to establish a malicious prosecution claim

under § 1983, a plaintiff must prove that the defendant initiated or continued a

proceeding against him without probable cause. [Because] [t]he [United States]

Supreme Court has held that [] malicious prosecution claims are Fourth Amendment

claims, a plaintiff must prove that he was also seized in order to prevail."  *Nielander v.*

*Bd. of County Comm'rs of County of Republic, Kan.*, 582 F.3d 1155, 1164-65 (10th Cir.

2009); *see also Pierce v. Gilchrist*, 359 F.3d 1279, 1285-86 (10th Cir. 2004)(noting that

"[t]he initial seizure is governed by the Fourth Amendment, but at some point after

arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process

Clause.").  Pertinent to this case, the Tenth Circuit has recently clarified that an

individual is not seized under the Fourth Amendment when a police officer issues a criminal summons against her. *Nielander*, 582 F.3d at 1165. That principle holds true even when the criminal summons results in some limitations on the defendant's activities. *Id.* (holding that limitation on out-of-state travel stemming from pending criminal charge initiated by a criminal summons was not sufficient to constitute a seizure under the Fourth Amendment.). Accordingly, a plaintiff seeking to maintain a malicious prosecution claim must demonstrate that she was "'seized' in the traditional sense," *i.e.* through "an intentional acquisition of physical control." *Becker v. Kroll*, 494 F.3d 904, 914-15 (10th Cir. 2007).

### B.    Whether Defendants Are Entitled to Qualified Immunity on Plaintiff's Malicious Prosecution Claim

Exercising its discretion under *Pearson*, 129 S. Ct. at 818, the Court will address first whether Plaintiff has stated a violation of a constitutional right. The foundational argument of Plaintiff's malicious prosecution claim is that Defendants unlawfully seized her by issuing, or contributing to the issuance of, criminal summonses. As *Nielander* makes clear, however, an individual is not seized within the meaning of the Fourth Amendment merely because a criminal summons is issued against her, *id.* at 1165, and Plaintiff's claim in this regard is thus without merit. Furthermore, because the actual issuance of a criminal summons does not constitute a seizure under the Fourth Amendment, certainly an officer's review of a criminal summons or preparation of a report that serves as the basis of a later criminal summons likewise would not constitute a seizure. Additionally, because Plaintiff was not seized by the issuance of criminal summonses against her, the analysis does not proceed to consideration of due process

principles because an initial seizure never occurred that would permit the analysis to reach that point.  However, the Court notes that to the extent Plaintiff seeks to hold Defendants liable for malicious prosecution, or any of her other § 1983 claims, based on Defendants' alleged violation of their duty to investigate allegations of a crime under NMSA 1978 § 29-1-1, that effort is without a basis in the law.  It is well-settled that "Section 1983 does not . . . provide a basis for redressing violations of state law, but only for those violations of federal law done under color of state law." *Jones v. City and County of Denver, Colo.,* 854 F.2d 1206, 1209 (10th Cir. 1988)(citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). While Plaintiff may not approve of Defendants' investigative techniques and charging decisions, her disapproval, whatever its merits, does not state a cognizable claim for malicious prosecution. Hence, even viewing the facts in the light most favorable to Plaintiff, the Court concludes that she has failed to prove a violation of her constitutional rights, and Defendants should therefore be granted qualified immunity on her malicious prosecution claim.

## IV.    Plaintiff's Equal Protection Claim

Defendants also move for qualified immunity on Plaintiff's equal protection claim on the ground that "[t]here has been no state action on the part of any of the Defendants to trigger any rights that Plaintiff can invoke under the Equal Protection Clause."  (Mot. Summ. J. at 14.)  In that vein, Defendants contend that Plaintiff "has never contacted any of the Defendants to report that she has been a victim of a crime and therefore she has never asked for any police protection of [sic] Defendants."  (*Id.*)  Furthermore, Defendants assert that the apparent basis of Plaintiff's equal protection claim, an alleged violation of state law, is not available as a basis for a claim under § 1983.

Plaintiff responds by describing the circumstances that she asserts demonstrate the APD's discriminatory enforcement of the law.  Specifically, Plaintiff contends that:

> A male, Norbert Tencza[,] goes to a substation and tells a story to a police officer (Officer Garcia, Officer Green, Officer Yara, Officer Worley, to name merely the defendants in the instant case).  The officers do not verify a single fact beyond, in a few cases, confirming the existence of some Order of Protection.  Based on APD policy, their training, and this information, Officers Garcia, Yara, and Werley each issue a summons for a criminal charge against Peggy Tencza.
>
> During this same time period, the Plaintiff, a female, files two police reports.  On September 9, 2006, Peggy Tencza filed a police report with Officer D. Jordan . . . alleging that Norbert Tencza was harassing her and that he was violating a no contact order.  Officer Jordan never filed a summons as against Norbert Tencza.
>
> On July 10, 2007, Peggy Tencza filed a police report with Officer J.T. Stone . . . alleging that Norbert Tencza was harassing her.  Officer Stone never filed a criminal summons as against Norbert Tencza.

(Resp. at 17 -18) (citations to exhibits omitted).  Additionally, Plaintiff mentions the letter that Ms. Bruce sent to APD Chief Schultz and maintains that Ms. Bruce's letter "gave [Chief Schultz] notice that Plaintiff was being harassed by [Norbert] and that APD's policy of not investigating Norbert Tencza's allegations was the moving force behind the continued harassment."  (*Id.* at 18.)  Plaintiff then apparently takes issue with Chief Schultz's response to Ms. Bruce's letter and his failure to issue a criminal summons against Norbert in response to that letter, which Plaintiff ostensibly maintains evinces an ongoing equal protection violation.  Finally, Plaintiff summarizes her argument by asserting that:

> in a real and repeated pattern — the female, Plaintiff, reports violations of no contact orders and harassment — and out of three notices to APD and individual officers — ZERO action was taken to protect Plaintiff.  In marked contrast — Norbert Tencza is three for three — tell a story, get Peggy Tencza hauled into court.

37

(Resp. at 18.)  Thus, according to Plaintiff, APD maintained a policy or custom of providing less protection to females who complain about domestic violence than to males who raise similar complaints.

Unfortunately, the parties' briefing on this issue is so deficient as to preclude a proper analysis by the Court.  Initially, Defendants' overly narrow focus on the purported lack of state action ignores the other aspects of an equal protection claim, *see Price-Cornelison v. Brooks*, 524 F.3d 1103, 1110-15 (10th Cir. 2008)(discussing components of an equal protection claim), which results in Defendants failing to offer any legal argument in that regard on which the Court could base its analysis. Additionally, and somewhat curiously, Defendants elected not to reply to Plaintiff's presentation of evidence regarding police reports she made to APD Officers who are not named as defendants in this case.  Plaintiff's argument related to those reports clarifies that the basis for her equal protection claim is an alleged disparate enforcement of domestic violence laws based on the gender of the complainant.  Adding to the confusion, Plaintiff did not explicitly state against whom she asserts that claim. Furthermore, Plaintiff, despite arguing that a policy or custom was the moving force behind the allegedly disparate enforcement of domestic violence laws, failed to identify any specific policy or supply evidence concerning a purported custom that she believes existed. Under these circumstances, the Court cannot analyze the factual merits of her claim. Moreover, Plaintiff did not present any legal authority to support her arguments and Defendants failed to address those arguments in their Reply; hence, the Court is without sufficient information to determine whether Defendants are entitled to qualified

immunity on Plaintiff's equal protection claim.  Therefore, at this time the Court will not

rule on Defendants' Motion for Summary Judgment as it applies to Plaintiff's equal

protection claim.

## VIII.  Plaintiff's State Constitutional Claims

In a footnote in their Motion for Summary Judgment, Defendants argue that:

> A party asserting a state constitutional claim in the absence of existing
> New Mexico precedent departing from federal authority on the point must
> cite the relevant constitutional principle and assert that the state
> constitutional provision at issue should be interpreted more expansively
> than the federal counterpart and provide reasons for interpreting the state
> provision differently from the federal provision.  *State v. Gomez*, 1997-
> NMSC-006, ¶ 23, 122 N.M. 777, 932 P.2d 1.  Since Plaintiff has not made
> any such assertion in her complaint, her state constitutional claim pled in
> Count V should be reviewed under the Fourth Amendment.  *See State v.
> Jason L.*, 2000-NMSC-018, ¶ 9, 129 N.M. 119, 2 P.3d 856.

(Mot. Summ. J. at 10 n.1.)[13]  The Court construes this footnote as Defendants urging the

Court to review all of Plaintiff's state constitutional claims under the Fourth

Amendment and to grant Defendants summary judgment on Plaintiff's state

constitutional claims.  Not surprisingly, given Defendants' cursory discussion of this

issue, Plaintiff did not respond to this argument in her Response.  Because the record is

not adequately developed to allow the Court to address the merits of Plaintiff's state

constitutional claims, the Court declines to do so at this time.

---

[13] Plaintiff's Amended Complaint (Doc. No. 24) does not contain a "Count V." The
Court attributes Defendants' erroneous reference to "Count V" to Plaintiff's inclusion of
a "Count V" in her original Complaint (*see* Doc. No. 1, Ex. 1).  What was previously
"Count V" now appears to be the "First Claim for Relief" in Plaintiff's Amended
Complaint.

Nevertheless, the Court makes clear that Defendants' argument that the analysis of Plaintiff's state constitutional claims should be governed solely by Fourth Amendment jurisprudence is without merit.  After reviewing Plaintiff's Amended Complaint, the Court has determined that Plaintiff is trying to assert two claims under the New Mexico Constitution, one for an alleged violation of her rights under Art. II, Sec. 10, which is New Mexico's equivalent to the Fourth Amendment, (*compare* N.M. Const. Art II, Sec. 10 *with* U.S. Const. amend IV), and another for an alleged violation of her rights under Art. II, Sec. 13, which is New Mexico's equivalent to the Eighth Amendment (*compare* N.M. Const. Art. II, Sec. 13 *with* U.S. Const. amend VIII).  (*See* Doc. No. 24 at 11.)  The latter claim under N.M. Const. Art. II, Sec. 13 is somewhat puzzling because Plaintiff has not pled a violation of her rights under the Eighth Amendment of the United States Constitution.  However, given the unorthodox nature of some of Plaintiff's other claims, the Court will not attribute the inclusion of a claim under N.M. Const. Art. II, Sec. 13 to a mere typographical error.  Accordingly, based on this reading of Plaintiff's Amended Complaint, her state constitutional claims invoke the jurisprudence of two federal counterparts, namely the Fourth and Eighth Amendments, and thus analyzing her claims solely under Fourth Amendment jurisprudence would not be proper.

As discussed above, because the legal arguments concerning Plaintiff's state constitutional claims have not been adequately developed, the Court will not address the merits of those claims at this time.

## CONCLUSION

Because of Plaintiff's pitiful efforts to allege intelligible claims and Defendants' consequent guessing, in their Motion for Summary Judgment and in their briefing, about the claims Plaintiff is trying to pursue, the Court has been confronted with a confusing mess.  The Court has been able to discern some of Plaintiff's claims and to rule on Defendants' Motion for Summary Judgment addressed to them.  All individual Defendants are entitled to qualified immunity on Plaintiff's First Amendment free speech claim because Plaintiff has failed to demonstrate that Defendants' conduct constituted a violation of clearly established law.  Likewise, all individual Defendants are entitled to qualified immunity on Plaintiff's malicious prosecution claim because Plaintiff was not seized by the issuance of criminal summonses against her, and thus her claim against Defendants does not invoke the protections of the Fourth Amendment.

It appears that Plaintiff is attempting to assert the following additional claims in regard to which the Court presently has insufficient information from which the Court can determine their validity:

1) A Fourteenth Amendment due process claim that Defendants violated Plaintiff's right to familial and intimate association;

2) An equal protection claim based on gender discrimination; and,

3) Two claims under the New Mexico Constitution.

The Court believes that the best approach is to permit Plaintiff to file yet another amended complaint in which Plaintiff is to allege, with precision, the factual and legal bases of the claims listed above, plus any other claims that Plaintiff attempted to assert in her Amended Complaint (Doc. No. 24).  However, this opportunity to amend her

complaint once again should not be construed as permission to assert new claims or to reassert claims previously dropped through her earlier amendment or claims dismissed by the Court's rulings in this Memorandum Opinion and Order.  The purpose of allowing a further amendment is simply to clarify the exact bases for the claims that were confusingly alleged in Plaintiff's Amended Complaint (Doc. No. 24).  The Court will allow Plaintiff until April 15, 2010 to file a Second Amended Complaint to clarify her claims.

**IT IS ORDERED THAT:**

1) Defendants' Motion for Summary Judgment (Doc. No. 28) is DENIED with respect to Defendants' request for quasi-judicial immunity;

2) Defendants' Motion for Summary Judgment (Doc. No. 28) is GRANTED with respect to Plaintiff's First Amendment free speech claim and Plaintiff's claim for malicious prosecution;

3) Because of the confusing nature of Plaintiff's other claims, the Court is unable to rule on any other aspects of Defendants' Motion for Summary Judgment at this time, so Defendants' Motion for Summary Judgment (Doc. No. 28) is denied as premature as to Plaintiff's other claims, with an opportunity for Defendants to file a new motion for summary judgment by May 14, 2010 addressing claims in Plaintiff's Second Amended Complaint; and,

4) Plaintiff must file a Second Amended Complaint by April 15, 2010 to clarify her claims.

_____
SENIOR UNITED STATES DISTRICT JUDGE